UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-mj-02459-Louis

UNITED STATES OF AMERICA

vs.

LEONARDO SANTILLI,

Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? __ Yes  _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? ___ Yes  _X_ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _/s/ Michael N. Berger_____
MICHAEL N. BERGER
ASSISTANT UNITED STATES ATTORNEY
Court No.: A5501557
99 N. E. 4th Street, 4th Floor
Miami, Florida 33132-2111
Tel: (305) 961-9445
Email: michael.berger2@usdoj.gov

ROBERT ZINK, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOHN-ALEX ROMANO
TRIAL ATTORNEY, FRAUD SECTION
1400 New York Avenue
Washington, DC 20005

AO 91 (Rev. 08/09) Criminal Complaint        original

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Leonardo Santilli,<br><br>*Defendant(s)* | Case No. 20-mj-02459-Louis |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2014-2017__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering Offenses |
| 18 U.S.C. § 1956(a)(2)(A) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957(a) | Illegal Monetary Transactions |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____s/_____
*Complainant's signature*

Shauna Willard, Homeland Security Investigations
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime
Sworn to before me and signed in my presence.

Date: 03/20/2020

*Judge's signature*

City and state: Miami, Florida

Lauren F. Louis, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Shauna L. Willard, being first duly sworn hereby depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with Homeland Security Investigation ("HSI"). I have been employed with HSI for 16 years. I am currently assigned to a group that investigates Money Laundering, Bulk Cash Smuggling, and Fraud. I am a Certified Anti-Money Laundering Specialist under the Association of Certified Anti-Money Laundering Specialists. Moreover, I have conducted and participated in investigations of violations of United States laws relating to violations of financial laws, such as money laundering.

2. I make this affidavit in support of a criminal complaint charging Leonardo Santilli with violations of Title 18, United States Code, Sections 1956(a)(2) (international money laundering), 1956(h) (conspiracy to commit money laundering) and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

3. The facts contained within this affidavit are both personally known by me, as well as relayed by others, including members of law enforcement and other witnesses. This affidavit sets forth only those facts that I believe are necessary to establish probable cause. As such, I have not included each and every fact known about this investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

### BACKGROUND

4. Leonardo Santilli ("Santilli"), hereinafter referred to as the defendant, is a Venezuelan and Italian citizen.

5. The defendant controlled the following companies in Venezuela—Constructora Cosaco Co. ("Cosaco") and PLD Inversiones C.A. ("PLD Inversiones").

6. The defendant controlled the following companies in the United States—SGO Group Corp. ("SGO Group") and A&M Support Group Inc. ("A&M Support"). SGO Group is registered to a virtual office located in Weston, Florida. A&M Support is registered to a residential address in South Miami, Florida.

7. Collectively, for purposes of this affidavit, the term "Defendant's Companies" will refer to the defendant's four Florida and Venezuela companies. The Defendant's Companies held corporate bank accounts at multiple banks in South Florida.

8. Petróleos de Venezuela, S.A. ("PDVSA") is Venezuela's state-owned and state-controlled oil company. PDVSA controls one of the largest reserves of oil in the world.

9. PDVSA has entered into joint ventures with a number of foreign oil companies to leverage the expertise of the foreign oil companies. PDVSA maintains a majority stake in these joint ventures, and largely controls the procurement process at these joint ventures. As relevant here, PDVSA controls four joint ventures in the oil-rich Orinoco belt of Venezuela:

   a. **Petrocedeño S.A. ("Petrocedeño"):** Petrocedeño is a joint venture between Total SA of France, Equinor ASA (formerly Statoil) of Norway, and PDVSA.

   b. **Petrolera Sinovensa S.A. ("Petrolera Sinovensa"):** Petrolera Sinovensa is a joint venture between China National Petroleum Company and PDVSA.

   c. **Petromonagas S.A. ("Petromonagas"):** Petromonagas is a joint venture between Rosneft Oil Company of Russia and PDVSA.

   d. **Petropiar S.A. ("Petropiar"):** Petropiar is a joint venture between Chevron Corporation of the United States and PDVSA.

10. PDVSA also has a procurement subsidiary responsible for the purchase of materials and equipment known as **Bariven, S.A. ("Bariven")**.

2

11. Collectively, for purposes of this Affidavit, the term "PDVSA Subsidiaries" will refer to the four joint ventures and the procurement entity.

12. Venezuela has been plagued by high levels of government corruption. For several years, Transparency International has ranked Venezuela as the most corrupt country in the Western Hemisphere.

## INVESTIGATION

13. In late 2017, federal law enforcement opened an investigation into corruption at the PDVSA Subsidiaries and the laundering of the proceeds of that corruption through bank accounts and real estate in Miami, Florida. Over the course of this investigation, law enforcement identified almost $1 billion in payments from the PDVSA Subsidiaries to bank accounts of various Venezuelan contractors in South Florida.

14. The investigation has revealed wide scale corruption at the PDVSA Subsidiaries involving inflated contracts. The corruption typically involves the following scheme. Corrupt PDVSA officials authorize an inflated contract (at times inflated four to five times the value of the underlying good) to a contractor. Once the contractor receives the money from the inflated contract, the contractor pays bribes and kickbacks to the corrupt PDVSA official. The contractor generally has connections to senior officials at PDVSA or senior officials in the Venezuelan government or military with whom the contractor shares proceeds of the inflated contract. The contractor makes the payments to the corrupt officials by paying front persons and shell entities in order to conceal the true recipient of the money and to disguise the nature of the transaction.

15. I have reviewed, among other things, bank records of the Defendant's Companies, certain emails of the defendant obtained via search warrant, contracts between the Defendant's Companies and the PDVSA Subsidiaries, and bribe ledgers obtained during the course of the

investigation. I have also interviewed a number of witnesses with direct knowledge of the defendant's corrupt schemes, including former PDVSA officials, former PDVSA contractors, and others connected to the schemes.

### Financial Analysis of the Defendant's Companies' Bank Accounts

16. A review of the source of funds flowing into the Defendant's Companies' accounts shows that nearly all of the incoming funds came from the PDVSA Subsidiaries. From July 2014 through August 2017, the Defendant's Companies received approximately $146.6 million from the PDVSA Subsidiaries through wire transfers to the Defendant's Companies' accounts in Miami as detailed below.

| Inflows to Defendant's Companies | | |
| --- | --- | --- |
| PDVSA Subsidiary | Approximate Total | Date Range |
| Petrocedeño | $70,300,000 | Sept. 2014 – July 2017 |
| Petropiar | $42,800,000 | July 2014 – Aug. 2017 |
| Bariven | $13,000,000 | May 2017 |
| Petrolera Sinovensa | $11,800,000 | May 2015 – Aug. 2016 |
| Petromonagas | $8,700,000 | July 2014 – Feb. 2017 |
| **Total** | **$146,600,000** | |

17. The bank records show that the Defendant's Companies acted as a broker supplying goods to the PDVSA Subsidiaries. In short, the Defendant's Companies purchased goods from established companies and supplied those goods to the PDVSA Subsidiaries. The bank records show that the Defendant's Companies used less than thirty percent of the funds for purchases from established companies. The remaining funds were transferred to the defendant's or his family's personal or corporate accounts, to trust accounts, to shell companies, and to various Venezuelan individuals' accounts with no obvious connection to the business of the Defendant's Companies.

**Inflated Contracts**

18. Mercantil Bank requested and obtained supporting documentation from the Defendant's Companies with regard to some of the incoming wire transfers from the PDVSA Subsidiaries and the outgoing transfers. These records reflect that the Defendant's Companies charged substantial markups in the procurement contracts with the PDVSA Subsidiaries as outlined by the below examples.

19. For example, one of the Defendant's Companies obtained a purchase order from Petropiar in September 2016 for the purchase of ten hawkjaws for the approximate amount of $9,300,000. According to Mercantil records, the defendant purchased these ten hawkjaws for approximately $2,500,000. Based on the Petropiar purchase order, the Defendant's Companies charged Petropiar nearly four times its underlying price. Law enforcement contacted the manufacturer that supplied the hawkjaws, and the company indicated that it would supply goods directly to PDVSA.

20. Similarly, one of the Defendant's Companies obtained a purchase order from Petrocedeño in December 2015 for the purchase of nine floating valves for approximately $5,500,000. Market research shows that these valves should have cost approximately $1,100,000. As above, from this purchase order, the Defendant's Companies charged the PDVSA Subsidiaries approximately five times the underlying price of the good.

21. Finally, one of the Defendant's Companies had purchase orders from Petrolera Sinovensa dated late October 2015 for the purchase of 55-gallon oil drums for approximately $9,200,000. Market research reveals that these drums should have cost around $2,000,000. Again, this purchase order reflects a markup of nearly five times the underlying price of the goods.

5

## Evidence of Bribe Payments and Money Laundering

22. The United States obtained a search warrant for the emails of the defendant and other individuals connected to the corruption and money laundering conspiracy.

23. On February 2, 2015, the defendant received an email from an associate at one of the Defendant's Companies with a spreadsheet of payments that appear to list bribe payments by date, amount, and recipient.

24. For example, the spreadsheet contains a line with a payment on December 22, 2014 to Finadco Overseas Corporation for approximately $101,270 and lists the beneficiary as a former senior official at Petrocedeño. The United States has identified a transfer of that amount to this company's bank account in Curacao from a Miami bank account of the Defendant's Companies.

25. Similarly, the spreadsheet lists two payments in late January 2015 totaling approximately $100,000 to AJG Suministros y Servicios Integral and lists the beneficiary as an official at Petropiar. The United States has identified two transfers totaling that approximate amount, in late January 2015, to this company's bank account in the United States from a Miami bank account of the Defendant's Companies.

26. Confidential Witness 1 ("CW1") was an associate of the defendant. CW1 maintained access to a different spreadsheet of bribe payments. The spreadsheet has a category of expenses under a header titled (as translated) "expenses of Leo," which, according to CW1, reflected expenses paid by the defendant. In this tab, there is a list of payments for an individual titled as "viejo." CW1 explained that "viejo" refers to a former senior official of PDVSA in the oil-rich Orinoco region (Venezuelan Official 1). The spreadsheet reflects payments totaling approximately $1.8 million for the benefit of this official, including, among other payments, a payment of $345,000 to purchase a house on Margarita Island in Venezuela for the benefit of

6

Venezuelan Official 1. The United States has identified the corresponding payment of $345,000 on May 16, 2016 from a Miami bank account of the Defendant's Companies to a bank account in Curacao.

27. On the same spreadsheet and in the same tab reflecting the defendant's expenses, CW1 identified line items reflecting bribe payments to different officials at the PDVSA Subsidiaries in a section titled (as translated) "commissions." There are seventy-two payments in this list totaling approximately $7.2 million made for the benefit of various individuals. CW1 identified several of these individuals as officials at the PDVSA Subsidiaries and stated that the defendant told CW1 that he (the defendant) had bribed those individuals in connection with the contracts.

28. For example, CW1 identified a payment on the spreadsheet of approximately $168,000. CW1 stated that this payment went for the benefit of Venezuelan Official 2, a former senior manager at Petropiar. The spreadsheet lists this payment by reference to "Inversiones Jeur" and the first name of the official. Through bank records, the United States has traced this payment to a transfer from a Miami bank account of the Defendant's Companies to a bank account for Inversiones Jeur in Panama on August 19, 2015. During the relevant period, the Defendant's Companies made approximately $850,000 in payments to Inversiones Jeur from their Miami bank accounts.

29. Similarly, CW1 identified payments of $1.4 million on the spreadsheet that are described as payments to buy a house for a senior Venezuelan procurement official at Petrocedeño – Confidential Witness 2 ("CW2"). The United States has identified, among other payments, payments totaling $1,000,000 from the Defendant Companies' bank accounts in Miami to a bank account of a Venezuelan individual on March 1, 2016 in furtherance of this house purchase. CW2

7

confirmed that he/she received this and other improper payments from the defendant in exchange for assisting in the awarding of contracts to the Defendant's Companies.

30. CW1 identified a payment of approximately $15,000 on the spreadsheet as a payment to an official at Petrocedeño –Confidential Witness 3 ("CW3"). CW3 has confirmed that he/she received a bribe payment from the defendant in this amount in connection with assistance in the contracting process at Petrocedeño.

31. Confidential Witness 4 ("CW4") was an official in the procurement department of Petrocedeño. CW4 acknowledged receiving approximately $220,000 in bribe payments from the defendant in exchange for expediting the award of a contract to the Defendant's Companies. Bank records show two payments totaling that approximate amount, in November and December 2015, from the Miami account of the Defendant's Companies to an overseas account used by CW4.

32. Confidential Witness 5 ("CW5") was an official in the legal department at Petrocedeño. CW5 approved the award of, and payment on, certain contracts with the PDVSA Subsidiaries. CW5 stated that he/she had a meeting with the defendant at Petrocedeño's offices in Venezuela. At this meeting, the defendant asked for an account to make a payment for the benefit of CW5. Ultimately, the defendant made a $201,180 payment in January 2015 from the Miami account of the Defendant's Companies to an overseas account of a shell corporation for the benefit of CW5 in exchange for CW5's assistance in the awarding of contracts to the Defendant's Companies and prioritizing payment on those contracts.

### The Defendant's Personal Use of the Funds

33. The defendant transferred large amounts of the funds received from the PDVSA Subsidiaries on these procurement contracts to personal accounts.

8

34. On February 13, 2017, the defendant caused a transfer of approximately $5,000,000 from one of the Defendant's Companies' accounts to an account at HSBC Private Bank in the name of a British-Virgin Island registered corporation controlled by the defendant and his family.

35. On August 8, 2017, the defendant again caused a transfer of approximately $5,000,000 from one of the Defendant's Companies' accounts to an account at HSBC Private Bank in the name of a British-Virgin Island registered corporation controlled by the defendant and his family.

36. Between July 16 and August 24, 2018, a Magistrate Judge in this District signed warrants for seventeen accounts held at financial institutions by the defendant and co-conspirators, based on probable cause to believe that the defendant, through the Defendant's Companies, engaged in a scheme to obtain inflated contracts from the PDVSA Subsidiaries through bribery and to launder the corrupt contract proceeds through bank accounts located in this District. The total amount seized pursuant to those warrants was approximately $44.7 million

37. Based on the foregoing, I respectfully submit that there is probable cause to believe that the following criminal offenses, among others, occurred in the Southern District of Florida:

- Between in or around July 2014, through in or around September 2017, the defendant did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with persons known and unknown to the Grand Jury to commit an offense against the United States, that is, Title 18, United States Code, Section 1956, as follows: (a) to knowingly conduct a financial transaction which involves the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and (b) to knowingly transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A), all in violation of Title 18, United States Code, Section 1956(h).

9

It is further alleged that the specified unlawful activity is an offense against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

- On or about May 16, 2016, the defendant did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, that is, a $345,000 wire transfer from a bank account in Miami of the Defendant's Companies to a bank account in Curacao, with the intent to promote the carrying on of specified unlawful activity, that is, offenses against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv), in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

- On or about February 13, 2017, the defendant did knowingly engage, attempt to engage, and cause others to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, that is, a $5,000,000 transfer from a bank account in Miami of the Defendant's Companies to a private bank account in Puerto Rico, such property having been derived from specified unlawful activity, that is, offenses against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv), in violation of Title 18, United States Code, Sections 1957 and 2.

Further your affiant sayeth naught.

                                                               s/l
                                                             Shauna A. Willard

Attested to by the applicant in accordance with Special Agent, HSI
the requirements of Fed. R. Crim. P. 4.1 by FaceTime
Sworn to and subscribed to before me this __20__ day of March 2020, in Miami, Florida.

Lauren F. Louis
United States Magistrate Judge